# EXCERPT FROM CASE WESTERN RESERVE LAW REVIEW ARTICLE

59 Case W. Res. 683, *
Copyright (c) 2009 Case Western Reserve Law Review
Case Western Reserve University
Spring, 2009
59 Case W. Res. 683
LENGTH: 22796 words

Note: Testers Standing Up for Title III of the ADA

NAME: Kelly Johnson+

BIO:

+ J.D. Candidate, Case Western Reserve University School of Law, 2009; B.A., John Carroll University, summa cum laude, 2006. I would like to thank Professor Jonathan Entin for all his guidance and support. Thanks to the members of the Law Review staff for their attention to detail and helpful comments. Finally, I owe my sincerest thanks to my parents, Curt and Diane Johnson. My Mother and Father have always been there for me and have challenged me to be a better person with each day that passes.

LEXISNEXIS SUMMARY:
... BMC Marketing Corp., a district court established a clear precedent against Title VII tester standing, ruling that the testers were prevented from seeking injunctive relief because they cannot argue the possibility of future injury. ... The House report on the bill stated: The purpose of the ADA is to provide a clear and comprehensive national mandate to end discrimination against individuals with disabilities and to bring persons with disabilities into the economic and social mainstream of American life; to provide enforceable standards addressing discrimination against individuals with disabilities, and to ensure that the Federal government plays a central role in enforcing these standards on behalf of individuals with disabilities. ... Support for Tester Standing: The History of Tester Standing in Other Civil Rights Contexts The consistent (though sometimes qualified) acceptance of tester standing under the FHA and Title VII supports the argument that courts should grant expansive standing rights under the ADA. ... Support for Tester Standing: Unreasonable Application of Lyons and Lujan Courts are mistaken in applying Lyons and Lujan to prevent standing to ADA testers. ... In response to the complicated nature of compliance with the ADA the federal government offers numerous free assistance resources to help businesses fulfill the requirements of Title III. ... An attorney in Southern California stated that, as a result of the numerous lawsuits he and his client had filed, 1,100 additional parking spots for people with disabilities and hundreds of ramps and rails were added to the defendants' facilities.

TEXT:
[*683]

One of the things Americans cherish most is autonomy. We want choices and the ability to make them on our own, without interference from anything or anyone. Each and every day we make choices; where to eat, buy gas, or shop for groceries, what movies theaters or playhouses to visit--the list is endless. This ability to choose is an integral aspect of being an American, yet millions of Americans lack this freedom due to disability.

Imagine being lyzed from the waist down and having to rely on a wheelchair for mobility. You stop at a restaurant, only to find out that there is no ramp to get into the establishment, so you politely ask those you are with to lift you up as numerous other patrons watch and point. Then, the hostess escorts you to a table. You struggle to maneuver your wheelchair through the narrow aisles only to realize that the tables are too low for your wheelchair to fit. The manager apologizes, inadvertently making a scene as you decide to just leave. You stop at the restroom before leaving, but it is not handicapped-accessible. Then when you try to wash your hands the sink is too high up, and as you strain to lift yourself out of the wheelchair you slip causing injury to your arms. You leave the restaurant embarrassed and frustrated, knowing that you can never go back to that restaurant again.

As a result, the ability to choose has been taken away--you no longer have the choice to visit a restaurant frequented by your friends and family. This scenario is unfortunately the reality that some people are forced to face as a result of public accommodations failing to [*684] comply with Title III of the Americans with Disabilities Act ("ADA"). 1

Congress passed the ADA in 1990 to fix a serious problem--namely, the seclusion of people with disabilities

resulting in explicit and implicit discrimination. 2 It was called the "'20th Century Emancipation Proclamation for all persons with disabilities.'" 3 Title III of the ADA contained broad language covering numerous public accommodations; both new construction and existing facilities were required by the statute to remove barriers to access. 4 The disabled population hoped that, as a result of the ADA, their lives would no longer be shaped by limited access and the inability to choose. 5 However, reality--a lack of compliance with the ADA and severe underenforcement of the statute--soon destroyed this hope. 6

Eighteen years after the passage of the ADA, numerous facilities are still not compliant, 7 leaving the disabled population in a second-class citizenship limbo. Title III of the ADA allows both the U.S. Attorney General 8 and private individuals to sue, 9 but the rate at which both the Attorney General and individuals are bringing suit seeking compliance is extremely low. 10 The Department of Justice's Disability Section, tasked with ADA enforcement, is understaffed, and many individuals are dissuaded from bringing suits because of the statute's complexity. 11 [*685]

Clearly the enforcement mechanism for Title III is inadequate, resulting in continued discrimination against people with disabilities. The answer to the problem of underenforcement may lie in tester standing. Testers are qualified individuals with disabilities who visit places of public accommodation to determine their compliance with Title III. 12 Testers have historically been used to uncover housing and employment discrimination, 13 but recently these individuals are taking on roles as private attorneys general in an attempt to increase compliance with Title III. These testers go out to places of public accommodation in an effort to "test" a facility's accessibility against the statutory mandates of the ADA. If a facility is not accessible, then the testers file lawsuits for injunctive relief, forcing the businesses to comply with the ADA. While these suits seem like a simple and effective solution, federal courts have been extremely skeptical of testers as plaintiffs and have dismissed many of the testers' cases for lack of standing. 14

This Note will explore the problems that arise as a result of the decisions that deny testers standing to sue under the ADA. Despite the skepticism about tester standing, courts should allow testers to bring Title III lawsuits, as it is the only way to finally bring the change intended under the ADA. Part I will discuss the intricacies of the standing doctrine. Part II will highlight the history of tester standing in cases brought under other civil rights statutes, specifically the Fair Housing Act and Title VII of the Civil Rights Act of 1964. Part III will detail the function of an ADA tester and chronicle the case law addressing tester standing under the ADA. Finally, Part IV will present the arguments in support of tester standing. [*686]

59 Case W. Res. 683, 683-686